IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEPHEN GIANNAROS,<br><br>                      Plaintiff,<br><br>      v.<br><br>EATSTREET, INC.,<br><br>                      Defendant. | Civil Action No.<br><br>COMPLAINT FOR DECLARATORY<br>AND INJUNCTIVE RELIEF |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Stephen Giannaros, by and through undersigned counsel, seeks a permanent injunction requiring a change in EatStreet, Inc.'s ("EatStreet" or "Defendant") corporate policies to cause its online food ordering platform to become, and remain, accessible to individuals who are partially sighted, visually impaired, or totally blind. In support thereof, Plaintiff respectfully asserts as follows:

## INTRODUCTION

1.     Plaintiff lives in Peabody, Massachusetts. He works for the Commonwealth as a Senior Vocational Rehabilitation Counselor, helping other Massachusetts residents with disabilities develop individualized plans for employment, among other things. LinkedIn, Steve Giannaros, https://www.linkedin.com/in/steve-giannaros-2967853b/ (last visited Jan. 6, 2020). Plaintiff is also a former professional musician. SoundCloud, stevegiannaros, https://soundcloud.com/sgiannaros (last visited Jan. 6, 2020).

2.     Plaintiff was diagnosed with Cone-rod dystrophy ("CRD") when he was twenty. CRD is a genetic eye disorder which causes vision loss as the light-sensing cells of the retina

gradually deteriorate. U.S. National Library of Medicine, *Cone-rod dystrophy*, https://ghr.nlm.nih.gov/condition/cone-rod-dystrophy (last visited Jan. 6, 2020).

3.      Today, Plaintiff has very little usable sight. He cannot see faces or text.

4.      As a result of his blindness, Plaintiff relies on screen reader software, including JAWS 2019 and VoiceOver with iOS to access online content.

5.      Screen reader "software translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a webpage to the user." *Andrews v. Blick Art Materials, LLC*, 286 F.Supp.3d 365, 374 (E.D.N.Y. 2017) (J. Weinstein).

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be "clicked," which will bring her to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand.

> The screen reading software uses auditory—rather than visual—cues to relay this same information. When a sight impaired individual reaches a link that may be "clicked on," the software reads the link to the user, and after reading the text of the link says the word "clickable."…Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with her keyboard.

*Id.*; *see also* American Federation for the Blind, Screen Readers, https://www.afb.org/blindness-and-low-vision/using-technology/assistive-technology-products/screen-readers (last visited Jan. 6, 2020) (discussing screen readers and how they work).

6.      Defendant operates "one of the largest independent online and mobile food ordering and delivery services in the U.S." EatStreet, About Us, https://eatstreet.com/about-us (last visited Jan. 6, 2020). Consumers may access Defendant's online ordering platform at www.eatstreet.com (the "Website") or by downloading mobile applications that Defendant makes available for iOS and Android ("Mobile Apps"), which Website and Mobile Apps Defendant owns, operates, and

controls. Defendant's Website and Mobile Apps enable customers to place take-out and delivery orders with a wide range of local restaurants, including restaurants in Boston and Worcester, Massachusetts. EatStreet, Home Page, https://eatstreet.com/ (last visited Jan. 6, 2020).

7.      Customers find local restaurants on Defendant's Website and Mobile Apps by entering their geographic location and food preferences.  Defendant then generates a list of nearby restaurants offering take-out and delivery service. Customers may place orders through the Website and Mobile Apps, which Defendant then transmits to local restaurants to fill and deliver to customers.

8.      Online ordering platforms, such as Defendant's Website and Mobile Apps, are critically important to individuals with visual disabilities, such as the Plaintiff, who have more difficulty than a sighted person traveling to restaurants to dine in or pick up food.

9.      Defendant is responsible for the policies, practices, and procedures concerning the Website and Mobile App's development and maintenance.

10.      Unfortunately, Defendant denies approximately 8.1 million Americans who have difficulty seeing access to the Website and Mobile Apps' food ordering services because the Website and Mobile Apps are largely incompatible with the screen reader programs these Americans use to navigate an increasingly ecommerce world. Press Release, United States Census Bureau, Nearly 1 in 5 People Have a Disability in the U.S., Census Bureau Reports *Report Released to Coincide with 22nd Anniversary of the ADA* (Jul. 25, 2012), https://www.census.gov/newsroom/releases/archives/miscellaneous/cb12-134.html (last visited Jan. 6, 2020) ("About 8.1 million people had difficulty seeing, including 2.0 million who were blind or unable to see.").

11.     Plaintiff brings this civil rights action against Defendant to enforce Title III, which requires, among other things, that a public accommodation (1) not deny persons with disabilities the benefits of its services, facilities, privileges and advantages; (2) provide such persons with benefits that are equal to those provided to nondisabled persons; (3) provide auxiliary aids and services—including electronic services for use with a computer screen reading program—where necessary to ensure effective communication with individuals with a visual disability, and to ensure that such persons are not excluded, denied services, segregated or otherwise treated differently than sighted individuals; and (4) utilize administrative methods, practices, and policies that provide persons with disabilities equal access to online content.

12.     By failing to make its online and mobile food ordering and delivery services, a public accommodation subject to Title III, available in a manner compatible with screen reader programs, Defendant deprives individuals who are partially sighted, visually impaired or totally blind the benefits it affords nondisabled individuals—thereby increasing the sense of isolation and stigma among these Americans that Title III was meant to redress.

13.     Because Defendant's Website and Mobile Apps are not and have never been accessible, and because upon information and belief Defendant does not have, and has never had, an adequate corporate policy that is reasonably calculated to cause its Website and Mobile Apps to become and remain accessible, Plaintiff invokes 42 U.S.C. § 12188(a)(2) and seeks a permanent injunction requiring that:

| Compl. ¶ | Relief Requested | Defendant's Deadline to notify Plaintiff's counsel of completion |
|---|---|---|
| 13(a) | Defendant retain a qualified consultant acceptable to Plaintiff ("Approved Accessibility Consultant") who shall assist it in improving the accessibility of its Website and Mobile Apps, including all third party content and plug-ins, so the services on the Website and Mobile Apps may be equally accessed and enjoyed by individuals with vision related disabilities. | 30-days of Court's Order |
| 13(b) | Defendant work with the Approved Accessibility Consultant to ensure that all employees involved in website and mobile application development be given accessibility training on a biennial basis, including onsite training to create accessible content at the design and development stages. | 180-days of Court's Order and every 180-days thereafter until the Court orders otherwise |
| 13(c) | Defendant work with the Approved Accessibility Consultant to perform an automated accessibility audit on at least a quarterly basis to evaluate whether Defendant's Website and Mobile Apps may be equally accessed and enjoyed by individuals with vision related disabilities on an ongoing basis. | 90-days of Court's Order and every 90-days thereafter until the Court orders otherwise |
| 13(d) | Defendant work with the Approved Accessibility Consultant to perform end-user accessibility/usability testing on at least a quarterly basis with said testing to be performed by humans who are blind or have low vision, or who have training and experience in the manner in which persons who are blind use a screen reader to navigate, browse, and conduct business on websites, in addition to the testing, if applicable, that is performed using semi-automated tools. | 90-days of the Court's Order and every 90-days thereafter until the Court orders otherwise |
| 13(e) | Defendant incorporate all of the Approved Accessibility Consultant's recommendations within sixty (60) days of receiving the recommendations. | 60-days of receiving recommendations until the Court orders otherwise |
| 13(f) | Defendant work with the Approved Accessibility Consultant to create an Accessibility Policy that will be posted on its Website and Mobile Apps, along with an e-mail address, instant messenger, and toll free phone number to report accessibility-related problems. | 60-days of the Court's Order |

| Compl. ¶ | Relief Requested | Defendant's Deadline to notify Plaintiff's counsel of completion |
|---|---|---|
| 13(g) | Defendant directly link from the header of the homepage and the footer on every other page of the Website and Mobile Apps a statement that indicates that Defendant is making efforts to maintain and increase the accessibility of its Website and Mobile Apps to ensure that persons with disabilities have full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of the Defendant through the Website and Mobile Apps. | 60-days of the Court's Order |
| 13(h) | Defendant accompany the public policy statement with an accessible means of submitting accessibility questions and problems, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the Accessibility Policy. | 60-days of the Court's Order |
| 13(i) | Defendant provide a copy of the Accessibility Policy to all web content personnel, contractors responsible for web content, and Client Service Operations call center agents ("CSO Personnel") for the Website and Mobile Apps. | 60-days of the Court's Order |
| 13(j) | Defendant train no fewer than three of its CSO Personnel to automatically escalate calls from users with disabilities who encounter difficulties using the Website and Mobile Apps. Defendant shall have trained no fewer than three of its CSO personnel to timely assist such users with disabilities at all times. Defendant shall establish procedures for promptly directing requests for assistance to such personnel including notifying the public that customer assistance is available to users with disabilities and describing the process to obtain that assistance. | 180-days of Court's Order |
| 13(k) | Defendant modify existing bug fix policies, practices, and procedures to include the elimination of bugs that cause the Website and Mobile Apps to be inaccessible to users of screen reader technology | 180-days of Court's Order |

| Compl. ¶ | Relief Requested | Defendant's Deadline to notify Plaintiff's counsel of completion |
|---|---|---|
| 13(l) | Plaintiff, his counsel, and their experts monitor the Website and Mobile Apps for up to two (2) years after the Approved Accessibility Consultant validates the Website and Mobile Apps are free of accessibility errors/violations to ensure Defendant has adopted and implemented adequate accessibility policies. To this end, Plaintiff, through his counsel and their experts, shall be entitled to consult with the Approved Accessibility Consultant at their discretion, and to review any written material, including but not limited to any recommendations the Approved Accessibility Consultant provides Defendant. | Until the Court orders otherwise |

14.    Web-based technologies have features and content that are modified on a daily, and in some instances an hourly, basis, and a one time "fix" to an inaccessible website or mobile application will not cause the online platform to remain accessible without a corresponding change in corporate policies related to those web-based technologies. Jonathan Lazur et al., Ensuring Digital Accessibility Through Process and Policy 140 (2015). As one leading commentator notes:

> The most significant problem is maintaining the accessibility of a large commercial site. Without policies, procedures and metrics—such as testing a release for accessibility before posting to the website and training in accessible design (so that accessibility is part of the design process the way, say, cybersecurity is)—the site's status as accessible will be temporary at best.

*Fighting for Accessible Website under the ADA: Daniel Goldstein, Brown Goldstein Levy, Baltimore*, Bloomberg BNA, Jan. 13, 2016, ISSN 1098-5190 (reproduced with permission from Electronic Commerce & Law Report, 21 ECLR, 2, 1/13/16, https://www.browngold.com/wbcntntprd1/wp-content/uploads/BNA-Fighting-for-Accessible-Websitess-Under-ADA.pdf) (last visited Jan. 6, 2020).

15.     To evaluate whether an inaccessible website or mobile application has been rendered accessible, and whether corporate policies related to web-based technologies have been changed in a meaningful manner that will cause the website or mobile application to remain accessible, the website or mobile application must be reviewed on a periodic basis using both automated accessibility screening tools and end user testing by disabled individuals:

> [I]f you have planned to redesign or add a certain segment to your site, then make it accessible from the start. It's far cheaper to plan for an elevator than to decide to add one once your 30-story building is complete. Or if you are re-branding, consider using templates that will ensure accessibility. Make sure you have policies, procedures and metrics in place so that you know if you are maintaining accessibility and can identify why, if you are not. Most of all, consult disabled consumers or a consumer organization before deciding what you are going to do, and have consumers actually test the changes.
>
> Something you imagine you may need to do, you may not need to do at all or may be able to do much cheaper. Something you hadn't thought to do may be critical to accessibility. And, of course, if you work with the disability community, they will spread the word that this is no longer a site to be avoided, but to be used.

*Id*. at 3.

## JURISDICTION AND VENUE

16.     The claims alleged arise under Title III such that this Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188.

17.     Defendant attempts to, and indeed does, participate in the Commonwealth's economic life by offering and providing its food ordering and delivery services over the Internet to Massachusetts residents. Unlike, for example, a winery that cannot sell and ship wine to consumers in certain states, Defendant purposefully avails itself of the benefits and advantages of operating an online business open 24-hours a day, 7-days a week, 365-days a year to Massachusetts residents. To this end, Defendant's Website specifically identifies Boston and Worcester, Massachusetts as communities in which its online meal delivery services are available. *See Access*

*Now Inc. v. Otter Products, LLC*, 280 F.Supp.3d 287 (D. Mass. 2017) (exercising personal jurisdiction over forum plaintiff's website accessibility claims against out-of-forum website operator) ("*Otter Products*"); *Access Now, Inc. v. Sportswear, Inc.*, 298 F.Supp.3d 296 (D. Mass. 2018) (same).

18.     Plaintiff was injured when he attempted to access Defendant's Website from his home in Peabody, Massachusetts but encountered barriers that denied him full and equal access to Defendant's online ordering services.

19.     "Massachusetts has a strong and historic interest in adjudicating this dispute involving its blind residents. It is the home of the Perkins School for the Blind, which was America's first school for the blind. Helen Keller was taught there." *Otter Products*, 280 F.Supp.3d at 294.

20.     Venue in this District is proper under 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred.

## PARTIES

21.     Plaintiff is and, at all times relevant hereto, has been a resident of Peabody, Massachusetts, located in Essex County.

22.     Plaintiff is and, at all times relevant hereto, has been legally blind and is therefore a member of a protected class under the ADA, 42 U.S.C. § 12102(2) and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 *et seq*.

23.     Defendant EatStreet, Inc. is a Delaware for-profit corporation with a principal place of business at 316 West Washington Ave., Suite 725, Madison, Wisconsin 53703.

## FACTS APPLICABLE TO ALL CLAIMS

24.     While the increasing pervasiveness of digital information presents an unprecedented opportunity to increase access to goods, content, and services for people with perceptual or motor disabilities, website developers often implement digital technologies without regard to whether those technologies can be accessed by individuals with disabilities. This is notwithstanding the fact that accessible technology is both readily available and cost effective.

### DEFENDANT'S ONLINE CONTENT

25.     Defendant's Website and Mobile Apps allow consumers to research, select and order food from local restaurants from the comfort and convenience of their own homes.

26.     Defendant is responsible for the policies, practices, and procedures concerning the Website and Mobile Apps' development and maintenance.

### HARM TO PLAINTIFF

27.     Plaintiff attempted to access Defendant's Website from Peabody, Massachusetts. Unfortunately, because of Defendant's failure to build its Website in a manner that is compatible with screen reader programs, Plaintiff is unable to understand, and thus is denied the benefit of, much of the services he wishes to access.

28.    Plaintiff attempted to access the Website using VoiceOver with iOS.

29.    "VoiceOver is a gesture-based screen reader that lets 
you enjoy using iPhone even if you don't see the screen. With
VoiceOver enabled, just triple-click the Home button to access it
wherever you are in iOS. Hear a description of everything happening
on your screen, from battery level to who's calling to which app your
finger is on. You can also adjust the speaking rate and pitch to
suit you…You can control VoiceOver using a simple set of gestures.
Touch or drag your finger around the screen and VoiceOver tells you
what's there. Tap a button to hear a description, then double-tap to
select. Or flick left and right to move from one element to the next.

When you interact with an element, a black rectangle appears around it so sighted users can follow

along. When you prefer privacy, you can activate a screen curtain to turn off the display

completely, but still hear all that VoiceOver has to say. Apple, Accessibility,

https://www.apple.com/accessibility/iphone/vision/ (last visited Jan. 6, 2020).

30.    Here    is    an
example of one online store's
use of sufficiently descriptive
alternative text to describe its
products to screen reader users.
Custom  Ink,  Home  Page,
https://www.customink.com/
(taken Mar. 28, 2019). The



image on the left illustrates what shoppers see when browsing Custom Ink's online store with an iPhone. To the right, is an image with alternative text, highlighted in green, which reads: "One burlap and cotton tote bag with a custom printed architectural company logo." Although invisible on the screen, screen reader auxiliary aids read this highlighted text aloud in order to describe Custom Ink's products to shoppers who cannot see. Without this detailed alternative text, screen reader users cannot determine what goods and services are available for purchase; they cannot shop online independently.

31.    Unfortunately, as a result of visiting Defendant's Website from Peabody, Massachusetts, and from investigations into the accessibility of Defendant's Website and Mobile Apps performed on his behalf, Plaintiff is aware that significant portions of Defendant's Website and Mobile Apps are unusable due to various barriers that deny him full and equal access to Defendant's online ordering services. For example:

a.    The Website and Mobile Apps prevent screen reader users from accessing primary content. For example, after users provide their location, the Mobile App displays nearby restaurants with whom they may place a delivery order. Users may filter the restaurant list by clicking one of four buttons at the top of the Mobile Apps, including ETA, Rating, Minimum, and Nearest. Unfortunately, screen readers cannot click or activate these buttons when a screen reader is turned on. As a result, Plaintiff is unable to narrow his search using this helpful filter, which is otherwise available to Defendant's customers who do not have a visual disability.



b.      Similarly, users who perceive content visually will notice a pop-up window after adding an item to their order on Defendant's Website. Unfortunately, the Website fails to notify screen reader users when these pop-up windows appear. Instead, Plaintiff's screen reader remains focused or "locked" on the Website's underlying page. As a result, Plaintiff must tab through each piece of content on the underlying page before his screen reader eventually focuses on the content of the Website's pop-up windows. This burdensome and unnecessary interaction makes it likely that Plaintiff will abandon the Website before accessing the pop-up window or otherwise completing his meal ordering process.



c.      The      Website and Mobile Apps do not provide a text equivalent for non-text elements. Providing text alternatives allows the information to be rendered in a variety of ways by a variety of users. A person who cannot see a picture, logo, or icon can have a text alternative read aloud using synthesized speech. For example, the Website and Mobile Apps provide a five-star rating for many restaurants with home Defendant partners. Users who perceive content visually can see




whether a particular restaurant has one, two, three, four, or five stars, and base their food ordering decisions on this information. Unfortunately, Defendant's accessibility policies, if any, fail to provide sufficiently descriptive alternative text for this important rating information. As a result, Plaintiff must make his purchasing decisions without the benefit of knowing whether the restaurants he's researching are well received by other consumers.

d.      Similarly, visitors to Defendant's Website Home Page will see text at the top that reads, "Cold Out? ORDER IN GET TASTY EATS DELIVERED." Were these visitors unfamiliar with Defendant's services previously, this text would inform them that Defendant provides an online food ordering and delivery service. Unfortunately, Defendant has programmed the Website in such a way that this text cannot be read by a screen reader. Instead, when Plaintiff hovers over this content with his screen reader, he hears "one heading level one main landmark." Because this audio output is meaningless, and is also one of the  first pieces of content Plaintiff encounters on the Website, he is deterred from attempting to navigate the Website further, which he has no reason to believe is more accessible to him than the Website's Home Page.

e.      The    Website
and Mobile Apps use color and
other  visual  cues  as  the  only
means    of    conveying
information,  indicating  an
action,  prompting  a  response,
or   distinguishing   elements.
Providing  information  that  is
conveyed   visually   through
another   audio   means   is



necessary to ensure that users who cannot see visual cues can still perceive necessary information.

For example, the Website and Mobile Apps prompt users to choose whether their order is for

Delivery or Takeout. Defendant identifies users' selections in the Mobile Apps by highlighting the

selection in turquoise. For the Website, Defendant converts the text to orange and also places an

orange border around the selection. Unfortunately, Defendant fails to include alternative text

instructing screen reader users that an action is required. Nor do these online ordering platforms

confirm users' selection once made. As a result, it is impossible for Plaintiff to make a selection

with any certainty, thereby deterring him from completing his food order.

f. Similarly, the Website and Mobile Apps use color to communicate whether a particular restaurant will deliver to a particular address. In some cases,



Defendant's online ordering platform uses a variety of colors—Plaintiff is aware of at least eight—to describe different delivery zones and the charges users will incur for delivery into each. Unfortunately, there is no evidence Defendant has attempted to provide this important information in an alternative audio format such that Plaintiff and other screen reader users can determine whether a particular restaurant delivers into their area. Defendant's failure in this regard renders Plaintiff's entire experience a guessing game and deters his use of the Website and Mobile Apps.

32. These barriers, and others, deny Plaintiff full and equal access to all of the services the Website and Mobile Apps offer, and now deter him from attempting to use the Website and Mobile Apps. Still, Plaintiff would like to, and intends to, attempt to access the Website and Mobile Apps in the future to place online food orders through Defendant's online ordering platform, or to test the Website and Mobile Apps for compliance with the ADA.

33. If the Website and Mobile Apps were accessible, *i.e.* if Defendant removed the access barriers described above, Plaintiff could independently place online food orders through Defendant's Website and Mobile Apps.

34. Though Defendant may have centralized policies regarding the maintenance and operation of its Website and Mobile Apps, Defendant has never had a plan or policy that is

16

reasonably calculated to make its Website and Mobile Apps fully accessible to, and independently usable by, individuals with vision related disabilities. As a result, the complained of access barriers are permanent in nature and likely to persist.

35.     The law requires that Defendant reasonably accommodate Plaintiff's disabilities by removing these existing access barriers. Removal of the barriers identified above is readily achievable and may be carried out without much difficulty or expense.

36.     Plaintiff has been, and in the absence of an injunction will continue to be, injured by Defendant's failure to provide its online ordering services in a manner that is compatible with screen reader technology.

## DEFENDANT'S KNOWLEDGE OF ONLINE ACCESSIBILITY REQUIREMENTS

37.     Defendant has long known that screen reader technology is necessary for individuals with visual disabilities to access its online content and services, and that it is legally responsible for providing the same in a manner that is compatible with these auxiliary aids.

38.     In a September 25, 2018 letter to U.S. House of Representative Ted Budd, U.S. Department of Justice Assistant Attorney General Stephen E. Boyd confirmed that public accommodations must make the websites they own, operate, or control equally accessible to individuals with disabilities. Assistant Attorney General Boyd's letter provides:

> The Department [of Justice] first articulated its interpretation that the ADA applies to public accommodations' websites over 20 years ago. This interpretation is consistent with the ADA's title III requirement that the goods, services, privileges, or activities provided by places of public accommodation be equally accessible to people with disabilities.

*See* Letter from Assistant Attorney General Stephen E. Boyd, U.S. Department of Justice, to Congressman   Ted   Budd,   U.S.   House   of   Representatives   (Sept.   25,   2018),

https://www.adatitleiii.com/wp-content/uploads/sites/121/2018/10/DOJ-letter-to-congress.pdf

(last visited Jan. 6, 2020).

39.     Indeed, the "Department [of Justice] first articulated its interpretation that the ADA

applies to public accommodations' websites over 20 years ago." As described above, on September

25, 2018, Assistant Attorney General Stephen E. Boyd confirmed nothing about the ADA, nor the

Department's enforcement of it, has changed this interpretation.

40.     More recently, the United States Supreme Court declined to review a Ninth Circuit

decision holding that (1) Title III of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*

("Title III") covers websites and (2) the imposition of liability on businesses for not having an

accessible website does not violate the due process rights of public accommodations. *See Robles*

*v. Domino's Pizza, LLC*, 913 F.3d 898 (9th Cir. 2019) cert. denied 589 U.S. ___ (U.S. Oct. 7, 2019)

(No. 18-1539).

41.     In the event Defendant were previously unaware of DOJ's "longstanding position"

"that the ADA applies to websites of public accommodations," *see National Association of the*

*Deaf v. Massachusetts Institute of Technology*, No. 3:15-cv-300024-MGM, DOJ Statement of

Interest in Opp. to Motion to Dismiss or Stay, Doc. 34, p. 4 (D. Mass. June 25, 2015), Plaintiff

sent Defendant a pre-litigation letter before filing this action. Plaintiff's efforts to resolve his

claims informally were unsuccessful such that he has no choice but to resort to litigation.

### THE PARTIES HAVE NO ADMINISTRATIVE REMEDIES TO PURSUE

42.     There is no DOJ administrative proceeding that could provide Plaintiff with Title

III injunctive relief.

43.     While DOJ has rulemaking authority and can bring enforcement actions in court, Congress has not authorized it to provide an adjudicative administrative process to provide Plaintiff with relief.

44.     Plaintiff alleges violations of existing and longstanding statutory and regulatory requirements to provide auxiliary aids or services necessary to ensure effective communication, and courts routinely decide these types of effective communication matters.

45.     Resolution of Plaintiff's claims does not require the Court to unravel intricate, technical facts, but rather involves consideration of facts within the conventional competence of the courts, *e.g.* (a) whether Defendant offers content and services on its Website, and (b) whether Plaintiff can access the content and services.

## SUBSTANTIVE VIOLATION

## Title III of the ADA, 42 U.S.C. § 12181 *et seq*.

46.     The assertions contained in the previous paragraphs are incorporated by reference.

47.     Defendant's Website and Mobile Apps are a place of public accommodation within the definition of Title III of the ADA, 42 U.S.C. § 12181(7). *See Otter Products*, 280 F.Supp.3d 293, n.4 (J. Saris) ("Several courts have held that a website can be treated as a public accommodation under Title III of the ADA."); *see also Gathers v. 1-800 Flowers.com, Inc*., 2018 WL 839381, *1 (D. Mass. Feb. 12, 2018) (J. Talwani) ("Defendant does not dispute that its websites are places of public accommodation subject to regulation by Title III of the ADA.*");* see also Robles v. Domino's Pizza, LLC*, 913 F.3d 898 (9th Cir. 2019).

48.     In the broadest terms, the ADA prohibits discrimination on the basis of a disability in the full and equal enjoyment of goods and services of any place of public accommodation. 42

U.S.C. § 12182(a). Thus, to the extent Defendant does not provide Plaintiff with full and equal access to its Website and Mobile Apps, it has violated the ADA.

49.     In more specific terms, Title III of the ADA imposes statutory and regulatory requirements to ensure persons with disabilities are not excluded, denied services, segregated or otherwise treated differently than other individuals as a result of the absence of auxiliary aids and services. 42 U.S.C. § 12182(b)(2)(A); 28 C.F.R. §§ 36.303(a), (c). Under these provisions, public accommodations must furnish appropriate auxiliary aids and services that comply with their effective communication obligations. *Id.*

50.     Auxiliary aids and services are necessary when their absence effectively excludes an individual from participating in or benefiting from a service, or fails to provide a like experience to the disabled person.

51.     Auxiliary aids and services include, but are not limited to, audio recordings, screen reader software, magnification software, optical readers, secondary auditory programs, large print materials, accessible electronic and information technology, other effective methods of making visually delivered materials available to individuals who are blind or have low vision, and other similar services and actions. 28 C.F.R. §§ 36.303(b)(2), (4).

52.     In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability. 28 C.F.R. §§ 36.303(c)(1)(ii). To this end, the Ninth Circuit has explained, "assistive technology is not frozen in time:  as technology advances, [ ] accommodations should advance as well." *Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1163 (9th Cir. 2011).

53.     By failing to provide its Website and Mobile Apps' content and services in a manner that is compatible with auxiliary aids, Defendant has engaged, directly, or through contractual, licensing, or other arrangements, in illegal disability discrimination, as defined by Title III, including without limitation:

(a)     denying individuals with visual disabilities opportunities to participate in and benefit from the online ordering services available on its Website and Mobile Apps;

(b)     affording individuals with visual disabilities access to its Website and Mobile Apps that is not equal to, or effective as, that afforded others;

(c)     utilizing methods of administration that (i) have the effect of discriminating on the basis of disability; or (ii) perpetuate the discrimination of others who are subject to common administrative control;

(d)     denying individuals with visual disabilities effective communication, thereby excluding or otherwise treating them differently than others; and/or

(e)     failing to make reasonable modifications in policies, practices, or procedures where necessary to afford its services, privileges, advantages, or accommodations to individuals with visual disabilities.

54.     Defendant has violated Title III by, without limitation, failing to make its Website and Mobile Apps' services accessible by screen reader programs, thereby denying individuals who are partially sighted, visually impaired, or totally blind the benefits of the Website and Mobile Apps, providing them with benefits that are not equal to those it provides others, and denying them effective communication.

55.     Defendant has further violated Title III by, without limitation, utilizing administrative methods, practices, and policies that allow its Website and Mobile Apps to be made

available without consideration of consumers who can only access the company's online ordering services with screen reader programs.

56.    Making its online food ordering platform compatible with screen readers does not change the content of Defendant's Website and Mobile Apps nor result in making the Website and Mobile Apps different, but enables individuals with visual disabilities to access the online services Defendant already provides.

57.    Defendant's ongoing violations of Title III have caused, and in the absence of an injunction will continue to cause, harm to Plaintiff and other individuals with visual disabilities.

58.    Plaintiff's claims are warranted by existing law or by non-frivolous argument for extending, modifying, or reversing existing law or for establishing new law.

59.    Pursuant to 42 U.S.C. § 12188 and the remedies, procedures and rights set forth and incorporated therein, Plaintiff requests relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

(A)    A Declaratory Judgment that at the commencement of this action Defendant was in violation of the specific requirements of Title III of the ADA described above, and the relevant implementing regulations of the ADA, in that Defendant took no action that was reasonably calculated to ensure that its Website and Mobile Apps are fully accessible to, and independently usable by, individuals with visual disabilities;

(B)    A permanent injunction pursuant to 42 U.S.C. § 12188(a)(2) and 28 CFR § 36.504(a) which directs Defendant to take all steps necessary to bring its Website and Mobile Apps into full compliance with the requirements set forth in the ADA, and its implementing regulations, so that its Website and Mobile Apps are fully accessible to, and independently usable by, blind

individuals, and which further directs that the Court shall retain jurisdiction for a period to be determined to ensure that Defendant has adopted and is following an institutional policy that will in fact cause it to remain fully in compliance with the law—the specific injunctive relief requested by Plaintiff is described more fully in paragraph 13 above.

(C)     Payment of actual, statutory, nominal, and other damages, as the Court deems proper;

(D)     Payment of costs of suit;

(E)     Payment of reasonable attorneys' fees, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505, including costs of monitoring Defendant's compliance with the judgment (*see Access Now, Inc. v. Lax World, LLC*, No. 1:17-cv-10976-DJC (D. Mass. Apr. 17, 2018) (ECF 11) ("Plaintiffs, as the prevailing party, may file a fee petition before the Court surrenders jurisdiction. Pursuant to *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 559 (1986), *supplemented*, 483 U.S. 711 (1987), and *Garrity v. Sununu*, 752 F.2d 727, 738-39 (1st Cir. 1984), the fee petition may include costs to monitor Defendant's compliance with the permanent injunction.");

(F)     Whatever other relief the Court deems just, equitable and appropriate; and

(G)     An Order retaining jurisdiction over this case until Defendant has complied with the Court's Orders.

Dated: January 6, 2020               Respectfully Submitted,

*/s/ Jason M. Leviton*
Jason M. Leviton (BBO# 678331)
**BLOCK & LEVITON LLP**
 260 Franklin Street, Suite 1860
Boston, MA 02110
Phone: (617) 398-5600
jason@blockesq.com

R. Bruce Carlson (*to be admitted pro hac vice*)
Kevin W. Tucker (*to be admitted pro hac vice*)
**CARLSON LYNCH, LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Phone: (412) 322.9243
bcarlson@carlsonlynch.com
ktucker@carlsonlynch.com

*Counsel for Plaintiff*